UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SADONNA LOU WATSON,                )
                                   )
            Plaintiff,             )
                                   )
      v.                           )   Case No. 4:12CV1427 JAR
                                   )                       (FRB)
CAROLYN W. COLVIN, Acting          )
Commissioner of Social Security,[1] )
                                   )
            Defendant.             )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

       This cause is before the Court on plaintiff's appeal of
an adverse determination by the Social Security Administration.
All pretrial matters were referred to the undersigned United States
Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate
disposition.

**I.   Procedural History**

       On April 1, 2010, the Social Security Administration
denied plaintiff Sadonna Lou Watson's application for Supplemental
Security Income filed pursuant to Title XVI of the Social Security
Act, 42 U.S.C. §§ 1381, et seq., in which she claimed she became
disabled on January 1, 2003.   (Tr. 55-59, 112-14.)   Plaintiff
subsequently amended her alleged onset date to November 12, 2009.

_____

       [1]On February 14, 2013, Carolyn W. Colvin became the Acting
Commissioner of Social Security.   Pursuant to Fed. R. Civ. P.
25(d), Carolyn W. Colvin is therefore automatically substituted for
former Commissioner Michael J. Astrue as defendant in this cause of
action.

(Tr. 115.) At plaintiff's request, a hearing was held before an Administrative Law Judge (ALJ) on March 10, 2011, at which plaintiff and a vocational expert testified. (Tr. 27-52.) On April 1, 2011, the ALJ denied plaintiff's claim for benefits finding plaintiff able to perform work in the national economy as supported by vocational expert testimony. (Tr. 12-22.) On June 26, 2012, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-3.) The ALJ's decision is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

Plaintiff now seeks judicial review of the Commissioner's final decision arguing that it is not based upon substantial evidence on the record as a whole. Specifically, plaintiff claims that the ALJ erred by failing to identify the weight accorded to the medical opinions of evidence and thus failed to properly evaluate these opinions. Plaintiff also claims that the ALJ's determination as to plaintiff's mental residual functional capacity (RFC) is not supported by any medical evidence of record and that the ALJ failed to provide a narrative discussion describing how the evidence of record supported his RFC conclusions. Plaintiff also contends that the ALJ failed to properly consider plaintiff's chronic mental illness. Finally, plaintiff claims that the ALJ's RFC finding failed to include all of the limitations caused by plaintiff's severe impairments. Plaintiff requests that the Commissioner's decision be reversed and that she be awarded benefits, or that the matter be remanded for further proceedings.

## II.  Testimonial Evidence Before the ALJ

A.   Plaintiff's Testimony

At the hearing on March 10, 2011, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was forty-five years of age.  Plaintiff was five feet, two inches tall and weighed 123 pounds.  (Tr. 33.)  Plaintiff completed the seventh grade and dropped out of school while in the eighth grade.  Plaintiff never obtained her GED nor participated in any vocational training.  (Tr. 34.)

Plaintiff's Work History Report shows plaintiff to have worked as a waitress, cashier, and in a factory in 1993; and worked at a lawn mower factory from 1994 to 1995.  Plaintiff performed additional factory work from 1998 to 1999 and worked as a trailer park manager from 1998 to 2003.  Plaintiff performed clerical work at a factory in 2002 and worked as a cashier at a convenience store in 2006.  In 2007 plaintiff worked on an assembly line in a factory.  In October 2009, plaintiff worked as a painter for a family friend.  (Tr. 139.)

Plaintiff testified that she could not work because of her inability to be around people.  Plaintiff testified that she gets nervous, has panic attacks, and breaks out in a cold sweat around people.  (Tr. 39.)  Plaintiff testified that she experiences panic attacks every day.  Plaintiff testified that she calms down after taking Xanax.  (Tr. 40-41.)  Plaintiff testified that she

cries every day and that thoughts of family members who have died trigger her crying spells. Plaintiff testified that she has suicidal thoughts nearly every day. (Tr. 43.) Plaintiff testified that she also has difficulty with concentration and memory and that her sister reads things to her and gives her reminders because of these problems. (Tr. 41, 44.)

As to her physical impairments, plaintiff testified that she has scoliosis of the spine which causes her to experience back pain on a daily basis. Plaintiff testified that she has difficulty walking because of the pain, but has no difficulty with sitting or with climbing stairs. Plaintiff testified that she takes Tramadol for the pain. Plaintiff testified that she can lift a gallon of milk. (Tr. 39-40.)

Plaintiff testified that she lives in a house with her sister and is able to do dishes and laundry. Plaintiff testified that she can carry a basket of laundry. Plaintiff testified that she can sweep and vacuum the floor but does not mop. (Tr. 40.) Plaintiff testified that her sister cooks for her. (Tr. 44.) Plaintiff testified that she has difficulty reading and expressed doubt regarding her ability to read and understand a newspaper article. (Tr. 41.) Plaintiff testified that she uses a computer and participates on social networking sites but does not play computer games because they are too stressful for her. (Tr. 42.)

As to her daily activities, plaintiff testified that she stays in bed most of the day. Plaintiff testified that her sister

sometimes forces her to go to the store so that she gets out of the house.  Plaintiff testified that she takes medication to help her sleep.  Plaintiff testified that she can attend to her personal hygiene.  Plaintiff testified that she does not have any hobbies.  Plaintiff testified that she has a driver's license and is able to drive but that she sometimes has difficulties remembering where she is going when she drives.  Plaintiff testified that she drove to the hearing, which was a three-hour trip, and that she was accompanied by her brother so he could read directions to her.  (Tr. 34, 42-44.)

B.   Testimony of Vocational Expert

James Israel, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

Mr. Israel characterized plaintiff's past work as a trailer park manager, in which she performed general clerical duties of collecting rent, to be semi-skilled and light; as a production assembler as unskilled and medium to heavy; and as a retail sales clerk as semi-skilled and light.  (Tr. 47.)

The ALJ then asked Mr. Israel to assume an individual of claimant's age, education and past work experience, and to further assume

> a person capable of performing at the light
> exertional level as defined by the Social
> Security regulations; however, this person has
> additional limitations in that they are
> limited to performing simple, repetitive tasks
> and with only occasional contact with the

public, coworkers and supervisors and no
transactional interaction with the public.

(Tr. 47-48.)

Mr. Israel testified that such a person would not be able to
perform plaintiff's past relevant work as a rent collector, but
that other jobs existed in the national economy that such a person
could perform, such as production assembler, of which 4,500 such
jobs exist in the State of Missouri; hand packer and wrapper, of
which 3,500 such jobs exist in the State of Missouri; and
production inspector checker and examiner, of which 1,100 such jobs
exist in the State of Missouri. (Tr. 48.)

The ALJ then asked Mr. Israel to assume a person with all
of the limitations previously described, and to further assume the
individual to "be limited to a supervised low stress environment,
not requiring a production rate, such as on an assembly line."
(Tr. 48.) In response, Mr. Israel testified that the number of
jobs to which he previously testified would be reduced by sixty
percent. (Tr. 48-49.)

The ALJ then asked Mr. Israel to assume a person with all
of the previously described limitations, with a further limitation
that the person can take unscheduled breaks, albeit no more in
number than what is normally allocated. Mr. Israel responded that
such an additional limitation would impact about fifty percent of
the jobs to which he testified. (Tr. 49-50.)

Finally, the ALJ asked Mr. Israel to assume an individual

with all of the previously described limitations, with an additional limitation that the individual would be absent from work four days each month due to medical issues. In response, Mr. Israel testified that such a person could not sustain any of the jobs previously described. (Tr. 50.)

Counsel then asked Mr. Israel to assume an individual of plaintiff's age, education and work experience "who retained the ability to apply common sense, understanding, to carry out simple one to two-step instructions for a total of six hours during an eight-hour day and could interact appropriately with coworkers, supervisors and the general public for zero to two hours during this eight-hour day." (Tr. 50-51.) Mr. Israel testified that such a person could not remain in competitive employment. (Tr. 51.)

### III.  Medical and School Records Before the ALJ

School records from Malden School show plaintiff to have obtained the following IQ scores in August 1972:  verbal-82, nonverbal-75, and overall-77; and in September 1975:  verbal-76, nonverbal-75, and overall-73.  (Tr. 200-01.)  Upon completion of sixth grade during the 1978-79 school year, plaintiff earned A's, B's and C's in all of her classes and was promoted to seventh grade in the regular classroom.  (Tr. 202.)

On April 15, 1997, plaintiff visited Dr. Christopher LaBonte with complaints that she slept all of the time, was moody and cried a lot.  Plaintiff reported that she used to take Prozac for depression but stopped taking the medication when her husband

lost his job because she could not afford it. Dr. LaBonte prescribed Prozac.[2]  (Tr. 244.)

From May 1997 to May 2000, plaintiff visited Dr. LaBonte on numerous occasions with complaints relating to various conditions such as headaches, sinusitis, shoulder pain, and ovarian cysts, for which medication was prescribed. From May 1997 to May 1998, plaintiff's prescription for Prozac was continually refilled. (Tr. 244-48.)

On May 8, 2000, plaintiff visited Dr. LaBonte and complained of feeling irritable and that she cried all of the time. Plaintiff was prescribed Paxil.[3]  (Tr. 248.)  On November 3, 2000, plaintiff reported that she felt stressed on account of family problems.  Prozac and Xanax[4] were prescribed.  (Tr. 249.)  From November 2000 to February 2001, plaintiff's prescription for Prozac was regularly refilled.  From November 2000 to October 2001, plaintiff's prescription for Xanax was regularly refilled.  (Tr. 249-50.)

On October 22, 2001, plaintiff complained to Dr. LaBonte

---

[2]Prozac is used to treat depression and panic attacks. Medline Plus (last revised Apr. 13, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689006.html>.

[3]Paxil is used to treat depression, panic disorder and social anxiety disorder.  Medline Plus (last revised Apr. 13, 2012) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698032.html>.

[4]Xanax (Alprazolam) is used to treat anxiety disorders and panic disorder.  Medline Plus (last revised Nov. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684001.html>.

that she had been experiencing back pain for about one month. (Tr. 250.) Plaintiff continued to complain of intermittent low back pain through January 31, 2002. Plaintiff was diagnosed with lumbosacral strain, was instructed as to low back exercises, and was prescribed Darvocet[5] and Vicodin.[6] (Tr. 250-51.)

On January 31, 2002, Dr. LaBonte prescribed Xanax for plaintiff. (Tr. 251.) From May 2002 through February 2003, plaintiff's prescription for Xanax was regularly refilled. Plaintiff was regularly prescribed Prozac from August 2002 to February 2003. (Tr. 252-54.) Plaintiff was instructed by Dr. LaBonte in February 2003 to discontinue Prozac, and Lexapro[7] was prescribed. (Tr. 254.)

On February 8, 2003, plaintiff was prescribed Celebrex[8] and Vicodin for lumbosacral pain and muscle spasm. (Tr. 254.)

On January 27, 2004, plaintiff complained of back pain to

---

[5]Darvocet is used to relieve mild to moderate pain. Medline Plus (last revised Mar. 16, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601008.html>.

[6]Vicodin is used to relieve moderate to severe pain. Medline Plus (last revised May 15, 2013)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html>.

[7]Lexapro is used to treat depression and generalized anxiety disorder. Medline Plus (last revised Apr. 13, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.html>.

[8]Celebrex is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis and ankylosing spondylitis. It is also used to relieve other types of short term pain. Medline Plus (last revised Aug. 15, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699022.html>.

Dr. LaBonte and also reported that she had experienced a panic attack.  Vicodin and Xanax were prescribed.  (Tr. 255.)

On April 23, 2004, plaintiff continued to complain of back pain to Dr. LaBonte and requested that she be prescribed Darvocet instead of Vicodin.  Darvocet was prescribed, and plaintiff's Xanax was refilled.  Xanax and Darvocet were refilled on May 24, 2004.  (Tr. 255.)  Thereafter, plaintiff did not visit Dr. LaBonte until May 5, 2005, at which time Alprazolam and Darvocet were prescribed.  (Tr. 255.)

From March 2006 to April 2007, plaintiff visited Dr. LaBonte on numerous occasions for treatment of various conditions, including headaches and pneumonia, for which medication was prescribed.  Throughout this period, plaintiff's prescriptions for Alprazolam and Darvocet were continually refilled.  On January 12, 2007, Dr. LaBonte noted plaintiff's depression.  (Tr. 256-57.)

From June 2007 to November 2007, plaintiff continually visited Dr. LaBonte for medication management of back pain and anxiety.  (Tr. 236-43.)  On November 27, 2007, Dr. LaBonte noted Skelaxin[9] to be helping plaintiff's back pain and that plaintiff's anxiety was okay.  (Tr. 236.)

On February 7, 2008, plaintiff's prescriptions for

_____

[9]Skelaxin is a muscle relaxant used with rest, physical therapy and other measures to relax muscles and relieve pain caused by strains, sprains and other muscle injuries.  Medline Plus (last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682010.html>.

Darvocet and Xanax were refilled. (Tr. 235.) On March 6, 2008, Dr. LaBonte noted plaintiff's diagnoses to be migraine headaches, tension headaches and anxiety disorder. Plaintiff was prescribed Prozac, and her prescriptions for Darvocet and Xanax were refilled. (Tr. 234.) On April 4, 2008, Dr. LaBonte instructed plaintiff to increase her dosage of Prozac. Plaintiff reported continued feelings of depression. With respect to plaintiff's back pain, Dr. LaBonte questioned whether plaintiff had convex scoliosis. (Tr. 233.)

From May 2008 through April 2009, Dr. LaBonte continued to note plaintiff's anxiety, depression and chronic back pain, as well as increasing fatigue. Prescriptions for Darvocet, Xanax and Prozac were continually refilled. (Tr. 225-32.)

On June 17, 2009, plaintiff was admitted to the psychiatric unit St. John's Mercy Medical Center after having overdosed on Xanax. Plaintiff reported that she acted impulsively in taking the medication on account of personal relationships. It was noted that plaintiff had been treated for anxiety symptoms and depression by her primary care physician. Plaintiff had never seen a psychiatrist. Plaintiff reported that she had a fairly good therapeutic response from Prozac and Xanax. Plaintiff had no history of suicide attempts. Plaintiff reported no physical complaints. Physical examination was unremarkable. Mental status examination showed plaintiff to be calm, pleasant and cooperative. Plaintiff reported her mood to be "better," and her affect was

noted to be euthymic. Plaintiff's thought process was noted to be goal-directed with linear thought content and no psychotic symptoms. Plaintiff denied any suicidal or homicidal ideations. Plaintiff was diagnosed with anxiety disorder and depression, not otherwise specified. Plaintiff was assigned a Global Assessment of Functioning (GAF) score of 50.[10] Counseling was provided to plaintiff. Plaintiff was discharged on June 18, 2009, and was prescribed Xanax and Prozac upon discharge. Dr. L. Peter Zhang recommended that plaintiff follow up with outpatient counseling and that plaintiff continue to see her primary care physician with respect to her depression and anxiety symptoms. Plaintiff was advised to consult a psychiatrist if her symptoms persisted. (Tr. 206-09.)

Plaintiff visited Dr. LaBonte in July and October 2009 for medication management. No change in plaintiff's medication is noted in the record. (Tr. 223-24.)

On January 5, 2010, plaintiff reported to Dr. LaBonte that she was depressed, lacked motivation and stayed in bed. (Tr. 222.)

_____

[10]A GAF (Global Assessment of Functioning) score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000). A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

On March 15, 2010, plaintiff underwent a consultative psychological evaluation for disability determinations. Plaintiff reported to Dr. Paul W. Rexroat that she was depressed. Plaintiff reported being treated with Xanax and Prozac as prescribed by her primary care physician for anxiety and depression, but that such medication did not make her feel better. Plaintiff reported that her physician wanted to prescribe Abilify but that she could not afford the medication. Plaintiff's admission to St. John's Mercy Medical Center for overdose on Xanax was noted. Plaintiff also reported having scoliosis and headaches. Mental status examination showed plaintiff to be anxious and tense and to cry when she talked about her problems. Plaintiff exhibited a moderately restricted range of emotional responsiveness and a flat affect. Plaintiff was noted to have a normal energy level and to be alert and cooperative. There was no indication of thought disorder. Plaintiff did not report anxiety to be a problem but reported being depressed for twenty years with symptoms such as wanting to sleep, feeling sad, crying every day, irritability, lack of motivation, isolation, forgetfulness, and low self esteem. Plaintiff reported sleeping eighteen hours a day. It was noted that plaintiff did not have unusual mood swings. Plaintiff reported frequent passive suicidal ideation but no homicidal ideation or attempts. No paranoia, hallucinations or delusions were reported. Examination of cognitive functioning showed plaintiff to function below the average range of intelligence. As to plaintiff's functional

limitations, Dr. Rexroat noted plaintiff to be able to understand and remember simple instructions and to be able to sustain concentration and persistence with simple tasks. Moderate limitations in plaintiff's ability to interact socially and adapt to her environment were noted. In the domain of Activities of Daily Living, Dr. Rexroat opined that plaintiff had moderate limitations, noting plaintiff to live with a friend and be able to cook and maintain her living area; but that she borrows money from family and friends, watches a lot of television, and has someone grocery shop for her. In the domain of Social Functioning, Dr. Rexroat opined that plaintiff had moderate limitations, noting that plaintiff exhibited good social skills in his office, reported having a couple of friends, usually got along with other people, and visited her sister and her son; but that she reported not being able to associate well, did not like to socialize, and did not like friends. In the domain of Concentration, Persistence and Pace, Dr. Rexroat opined that plaintiff could sustain concentration, persistence and pace with simple tasks but that her memory functioning appeared to be below average. Upon conclusion of the evaluation, Dr. Rexroat diagnosed plaintiff with major depression, recurrent, severe without psychotic features. Dr. Rexroat assigned a current GAF score of 42 and opined that plaintiff's prognosis was good. (Tr. 297-300.)

On March 30, 2010, Dr. Kyle DeVore, a psychological consultant with disability determinations, reviewed records of

plaintiff's admission to St. John's Mercy Medical Center, recent treatment by Dr. LaBonte, and Dr. Rexroat's consultative evaluation, and opined in a Psychiatric Review Technique Form that plaintiff's recurrent major depression caused mild limitations in the domains of Activities of Daily Living and in Maintaining Concentration, Persistence or Pace; and moderate limitations in the domain of Maintaining Social Functioning. Dr. DeVore further opined that plaintiff experienced no repeated episodes of decompensation of extended duration. (Tr. 302-12.)

In a Mental RFC Assessment completed that same date, Dr. DeVore opined that plaintiff had no significant limitations in the domain of Adaptation and in the domain of Understanding and Memory. In the domain of Sustained Concentration and Persistence, Dr. DeVore opined that plaintiff was mildly limited in her ability to carry out detailed instructions and in her ability to work in coordination with or proximity to others without being distracted by them, but was not otherwise significantly limited. In the domain of Social Interaction, Dr. DeVore opined that plaintiff was mildly limited in her ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, but was not otherwise significantly limited. (Tr. 313-15.)

Plaintiff returned to Dr. LaBonte on April 15, 2010, who noted plaintiff's depression and increased fatigue. Dr. LaBonte

diagnosed plaintiff with fatigue, anemia and back pain. Results from laboratory testing for fatigue and anemia were normal. Darvocet was prescribed for back pain. (Tr. 337-41.)

On May 4, 2010, plaintiff reported to Dr. LaBonte that she was doing 100 times better on Pristiq[11] and Abilify.[12] Dr. LaBonte instructed plaintiff to increase her dosage of Pristiq for depression, to continue with Abilify for bipolar disorder, and to continue with Darvocet for back pain. (Tr. 335-36.) On July 15, 2010, Dr. LaBonte instructed plaintiff to continue with Pristiq and Abilify for depression. (Tr. 333-34.)

Plaintiff returned to Dr. LaBonte on August 5, 2010, and reported that she lost her medications due to a house fire. Dr. LaBonte refilled plaintiff's prescriptions for Xanax, Abilify and Darvocet. (Tr. 331-32.) On September 9, 2010, plaintiff's prescriptions for Xanax and Darvocet were refilled. (Tr. 329-30.) Plaintiff returned to Dr. LaBonte's office on November 16, 2010, and reported that she felt lethargic with Trazodone.[13] Plaintiff's current medications were noted to include Trazodone, Xanax,

---

[11]Pristiq is used to treat depression. Medline Plus (last revised Jan. 15, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a608022.html>.

[12]Abilify is used to treat the symptoms of schizophrenia, bipolar disorder and depression. Medline Plus (last revised May 16, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603012.html>.

[13]Trazodone is used to treat depression. Medline Plus (last revised Aug. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html>.

Darvocet, Pristiq, and Abilify.  Plaintiff was noted to have anxiety and insomnia.  (Tr. 327-28.)

On January 25, 2011, plaintiff underwent a consultative psychological evaluation upon referral by her attorney.  Plaintiff reported to Dr. F. Timothy Leonberger that she could not work because she has severe panic attacks when she is around people, becomes stressed when she has to be somewhere on time, and has had long term nerve problems.  Plaintiff reported that she was in special education classes during school and had to repeat the fourth grade because of terrible grades.  Plaintiff reported that she left school because the girls did not like her and she got into a lot of fights.  As to her previous work, plaintiff reported that she managed a small bar for five years and left the job in 2003 when the owner died and the bar closed.  Plaintiff reported that prior to this job, she worked for several years managing a trailer park and was responsible for collecting rent, cleaning vacant trailers, and handling complaints and evictions.  Plaintiff reported that she left this job when an evicted tenant shot at her son.  Plaintiff reported that she had attempted factory work subsequent to 2003 but felt too closed in.  Plaintiff reported her medical problems to include migraine headaches and a lump on her scalp.  Plaintiff could think of no other significant medical problems.  Plaintiff reported her current medications to be

Alprazolam, Tramadol,[14] Trazodone, Abilify, and Pristiq. Plaintiff reported having been treated for a number of years by her primary care physician for anxiety and depression. Plaintiff reported that she lived with her sister and brother and visited with her cousin and son on a daily basis. Plaintiff reported that she sleeps throughout much of the day but cleans the house, does laundry, makes simple meals, and goes grocery shopping. Mental status examination showed plaintiff to be oriented times four. Plaintiff's speech was normal, and her thinking was logical and sequential. Plaintiff's mood was noted to be depressed, and her affect was sad. Dr. Leonberger noted plaintiff's attention and concentration to be generally adequate. Plaintiff's insight was noted to be fair to good. Test results from the WAIS-IV showed plaintiff's full scale IQ to be 74, which placed plaintiff in the borderline range of intellectual functioning. Upon conclusion of the evaluation, Dr. Leonberger reported that "[i]n addition to being significant [sic] depressed, Ms. Watson experiences extreme anxiety in many social situations. At times, her anxiety almost reaches the level of a panic attack. She also appears to be overly dependent on those around her and has difficulty in maintaining her independence and relationships." Dr. Leonberger diagnosed plaintiff with major depressive disorder, recurrent; social phobia;

---

[14]Tramadol is used to relieve moderate to moderately severe pain. Medline Plus (last revised Oct. 15, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html>.

and dependent personality disorder.  Dr. Leonberger assigned a GAF score of 50, opining that 50 was the highest score obtained within the past year.  As to plaintiff's functional limitations, Dr. Leonberger opined that plaintiff had mild to moderate limitations in the domain of Activities of Daily Living, noting plaintiff to be capable of performing most activities of daily living but to become quite anxious and nervous in social situations.  Dr. Leonberger opined that plaintiff had marked limitations in the domain of Social Functioning, noting plaintiff to have significant interpersonal problems; not to have developed many friendships; and to appear depressed, dependent and despondent.  In the domain of Concentration, Persistence or Pace, Dr. Leonberger opined that plaintiff had moderate to marked limitations, noting that while plaintiff appeared to have good attention and concentration within her home, she was likely to become quite anxious and unnerved in social and occupational settings.  Finally, Dr. Leonberger opined that plaintiff would suffer marked deterioration or decompensation in work or work-like settings given her current psychiatric diagnoses and limited intellectual functioning.  (Tr. 317-22.)

On February 1, 2011, plaintiff visited Dr. William Moorehead.  It was noted that plaintiff needed a new doctor due to her recent move.  Dr. Moorehead noted plaintiff's medications to include Xanax, Tramadol, Pristiq, and Abilify and that plaintiff was diagnosed with depression in 2003.  Plaintiff's suicide attempt in 2009 was noted.  It was noted that plaintiff had applied for

disability benefits and that she had an upcoming appointment with a psychiatrist as arranged by her attorney. Dr. Moorehead instructed plaintiff to continue with Xanax and to decrease her dosage of Tramadol. (Tr. 316.)

In a Medical Source Statement (MSS) completed February 18, 2011, Dr. Leonberger opined that, in the domain of Activities of Daily Living, plaintiff was markedly limited in her ability to cope with normal stress, function independently, behave in an emotionally stable manner, and maintain reliability. In the domain of Social Functioning, Dr. Leonberger opined that plaintiff was markedly limited in her ability to interact with strangers or the general public, accept instructions or respond to criticism, and maintain socially acceptable behavior. Dr. Leonberger further opined that plaintiff was moderately limited in her ability to relate to family, peers or caregivers. In the domain of Concentration, Persistence or Pace, Dr. Leonberger opined that plaintiff was markedly limited in her ability to maintain attention and concentration for extended periods, perform at a consistent pace without an unreasonable number and length of breaks, sustain an ordinary routine without special supervision, and respond to changes in a work setting. Dr. Leonberger opined that, during an eight-hour workday, plaintiff could apply commonsense understanding to carry out simple one- or two-step instructions for a total of six hours. Dr. Leonberger further opined that, for zero to two hours during an eight-hour workday, plaintiff could interact

appropriately with coworkers, supervisors and/or the general public. Dr. Leonberger further opined that plaintiff's psychological symptoms would cause her to be absent from or late to work at least three times a month. (Tr. 323-26.)

## IV. The ALJ's Decision

The ALJ found that plaintiff had not engaged in substantial gainful activity since November 12, 2009. The ALJ found plaintiff's scoliosis of the spine, depression, borderline intellectual functioning, and dependent personality disorder to constitute severe impairments but that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ determined plaintiff to have the RFC to perform light work but that plaintiff was limited to performing simple and repetitive tasks with only occasional interaction with coworkers, supervisors and the public. The ALJ determined plaintiff to have no past relevant work. Considering plaintiff's age, education, work experience, and RFC, the ALJ determined that jobs exist in significant numbers in the national economy that plaintiff could perform, and specifically, assembler, hand packer and product inspector, to which the vocational expert testified. The ALJ thus found plaintiff not to be disabled. (Tr. 15-22.)

## V. Discussion

To be eligible for Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled.

Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the

impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." Id. (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v.

Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Because the ALJ committed no legal error and the decision is supported by substantial evidence on the record as a whole, the decision of the Commissioner finding plaintiff not to be disabled must be affirmed.

A.    Evaluation of Opinion Evidence

Plaintiff claims that the ALJ's decision is "devoid of any explanation as to the weight given to *any* of the medical opinions provided." (Pltf.'s Brief, Doc. #13, at p. 11.  Emphasis in original.)  A careful review of the ALJ's decision belies this contention.

In evaluating opinion evidence, the Regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, non-treating sources and non-examining sources.  See 20 C.F.R. § 416.927(f)(2)(ii).[15]  By explaining the weight given to medical source opinions, an ALJ both complies with the Regulations and assists the Court in reviewing the decision. See Willcockson v. Astrue, 540 F.3d 878, 880 (8th Cir. 2008). Substantial evidence does not support an ALJ's decision if it cannot be determined what, if any, weight the ALJ afforded the opinion of a medical source.  McCadney v. Astrue, 519 F.3d 764, 767

---

[15]Citations to 20 C.F.R. § 404.1527 are to the 2011 version of the Regulations which were in effect at the time the ALJ rendered the final decision in this cause.  This Regulation's most recent amendment, effective March 26, 2012, reorganizes the subparagraphs relevant to this discussion but does not otherwise change the substance therein.

(8th Cir. 2008); see also Woods v. Astrue, 780 F. Supp. 2d 904, 913-14 (E.D. Mo. 2011).

In his written decision, the ALJ thoroughly set out Drs. Rexroat's and Leonberger's findings made during their respective psychological evaluations of plaintiff. Likewise, the ALJ addressed the RFC assessment completed by State agency consultant, Dr. DeVore. (Tr. 19-20.) The ALJ then addressed each of their medical opinions, citing reasons to accord weight to and/or discount said opinions. For the following reasons, the ALJ did not err in his determination.

With respect to Dr. Leonberger's medical opinion, it can be determined from a review of the ALJ's decision *in toto* that the ALJ's discounted the opinion. Indeed, the ALJ provided multiple reasons to discount Dr. Leonberger's opinion that plaintiff suffered marked functional limitations:

> The claimant was referred to Dr. Leonberger by her counsel not for the purpose of any treatment, but for a one time evaluation and report. Dr. Leonberger's testing was consistent with borderline intellectual functioning, which was supported by her prior testing results. The claimant was able to work in 1994 at the substantial gainful activity level with her borderline intellectual functioning. The psychologist concluded that there were marked levels of impairment regarding social functioning and decompensation in work or work-like settings. However, his conclusions are not supported by the preponderance of the evidence. Although she advised him that she gets anxious in such situations as going to the grocery store, within her Function Report she noted that she

> goes shopping regularly once a month. Despite her alleged limited social functioning, within Exhibit 5E, a friend named Roger Gullet, reported that he was seeing her 4 or 5 days per week. They were spending evenings together watching television, cooking together, and eating supper together. Additionally, she told Dr. Leonberger that she would visit with a cousin and her son on a daily basis.

(Tr. 20.)

The ALJ's explanation supporting this determination is supported by substantial evidence on the record as a whole. See Goff v. Barnhart, 421 F.3d 785, 790-91 (8th Cir. 2005) (inconsistency with other substantial evidence alone is sufficient to discount a physician's opinion; opinion that claimant would have difficulty maintaining social functioning inconsistent with substantial evidence of claimant's ability to relate well with other people); Pearsall, 274 F.3d at 1218 (medical record did not support alleged limitations caused by mental impairment where claimant's activities were not indicative of intense fear of crowds or people); Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) (per curiam) (condition that was present but not disabling during working years and has not worsened cannot be used to prove a present disability). Indeed, from a review of plaintiff's self-reports made to Dr. Leonberger during the clinical interview portion of the evaluation, it appears that Dr. Leonberger's opinion as to plaintiff's marked limitations are based largely on plaintiff's subjective complaints. It is not error for an ALJ to discount the opinion of a one-time consulting

physician in such circumstances.  See Wildman v. Astrue, 596 F.3d
959, 967 (8th Cir. 2010); Kirby v. Astrue, 500 F.3d 705, 709 (8th
Cir. 2007); Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir.
2005).  In addition, the undersigned notes that during his
evaluation of plaintiff, Dr. Leonberger opined that plaintiff had
mild to moderate limitations in the domain of Activities of Daily
Living, but that he opined in his subsequent MSS that such
limitations were marked.  Where a physician renders inconsistent
opinions, they are entitled to less deference.  See Wagner v.
Astrue, 499 F.3d 842, 849-50 (8th Cir. 2007) (and cases cited
therein) (physician opinions that are internally inconsistent are
entitled to less deference).

     With respect to Drs. Rexroat and DeVore, it can be
determined from a review of the ALJ's decision in toto that the ALJ
accorded some weight to their respective opinions:

> Dr. Rexroat concluded that the claimant could
> sustain concentration and persistence with
> simple tasks.  She was described as having
> moderate limitations for interacting socially.
> She reported that she was cooking, cleaning,
> and watching a lot [of] television.    Dr.
> DeVore, as medical consultant for the state
> agency, concluded that she could perform
> simple and repetitive work tasks involving
> limited socialization. . . . She is restricted
> in her ability to work, but she is not unable
> to work.  She is limited to performing simple
> and repetitive work with only occasional
> interaction with coworkers, the public, and
> supervisors.

(Tr. 20-21.)

This determination to accord some weight to these opinions is supported by substantial evidence on the record as a whole.

During his evaluation of plaintiff, Dr. Rexroat noted plaintiff to be able to sustain concentration with simple tasks, having observed plaintiff solve simple mathematical problems and count backwards from twenty by two's with only one error. (Tr. 299.) Indeed, during his evaluation of plaintiff, Dr. Leonberger likewise noted plaintiff's attention and concentration to be generally adequate, with plaintiff exhibiting logical and sequential thinking. (Tr. 320.) As observed by the ALJ, Dr. DeVore's opinion, rendered after his review of the medical evidence of record, was consistent with this finding. See Casey v. Astrue, 503 F.3d 687, 694 (8th Cir. 2007) (not error for an ALJ to consider opinion of State agency consultant rendered upon review of the medical evidence which was consistent with medical evidence of record). With respect to plaintiff's social functioning, the ALJ identified evidence of record which was consistent with Dr. Rexroat's opinion that plaintiff suffered only moderate limitations thereof. Specifically, the ALJ noted the record to show that plaintiff participated in social networking sites on the computer, regularly went shopping, regularly visited and socially interacted with friends and relatives, and demonstrated good social skills. In addition, the ALJ noted that no treating physician, including Dr. LaBonte, reported that plaintiff was emotionally unable to perform work-related functions. See Krogmeier v. Barnhart, 294

F.3d 1019, 1025 (8th Cir. 2002) (ALJ may rely on opinion of consulting physician when coupled with an independent review of the medical evidence); Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001) (weight of the medical evidence was more in keeping with the restrictions described by the consulting physician). See also Forte v. Barnhart, 377 F.3d 892, 896 (8th Cir. 2004) (treating physician never suggested that impairment imposed any work-related limitations). Where, as here, there are conflicts in the medical opinion evidence, it is the duty of the Commissioner to resolve such conflicts. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012); Spradling v. Chater, 126 F.3d 1072, 1075 (8th Cir. 1997); Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995).

A review of the ALJ's decision shows the ALJ to have evaluated all of the opinion evidence of record and to have adequately explained his consideration thereof such that this Court can determine what weight the ALJ afforded the medical source opinions. Accordingly, although the ALJ did not use specific terms to identify the precise weight he accorded such opinions, the failure to do so here does not require his finding of non-disability to be set aside. See Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992) (administrative finding not required to be set aside when deficiency in opinion-writing technique has no bearing on outcome).

B.    RFC Determination

In his decision, the ALJ made specific findings as to

plaintiff's RFC.  Plaintiff claims that the ALJ's RFC determination fails to include all limitations caused by plaintiff's severe impairments.  Plaintiff also claims that no medical evidence supports the ALJ's mental RFC determination.  Finally, plaintiff contends that the ALJ failed to include a narrative discussion supporting his mental RFC determination.

A claimant's RFC is what she can do despite her limitations.  Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001).  The claimant has the burden to establish her RFC. Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  The ALJ determines a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations.  Goff, 421 F.3d at 793; Eichelberger, 390 F.3d at 591; 20 C.F.R. § 416.945(a).  A claimant's RFC is a medical question, however, and some medical evidence must support the ALJ's RFC determination.  Eichelberger, 390 F.3d at 591; Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001).  The ALJ is "required to consider at least some supporting evidence from a [medical professional]" and should therefore obtain medical evidence that addresses the claimant's ability to function in the workplace.  Hutsell, 259 F.3d at 712 (internal quotation marks and citation omitted).  An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand.  Id.

The RFC assessment must include a
narrative discussion describing how the
evidence supports each conclusion, citing
specific medical facts (e.g., laboratory
findings) and nonmedical evidence (e.g., daily
activities, observations). In assessing RFC,
the adjudicator must discuss the individual's
ability to perform sustained work activities
in an ordinary work setting on a regular and
continuing basis (i.e., 8 hours a day, for 5
days a week, or an equivalent work schedule),
and describe the maximum amount of each work-
related activity the individual can perform
based on the evidence available in the case
record. The adjudicator must also explain how
any material inconsistencies or ambiguities in
the evidence in the case record were
considered and resolved.

SSR 96-8p, 1996 WL 374184, at *7 (Soc. Sec. Admin. July 2, 1996)
(footnote omitted).

As an initial matter, to the extent plaintiff claims that
the ALJ erred by failing to consider the opinion of Dr. Leonberger
in determining plaintiff's RFC, the ALJ properly determined to
discount this opinion. (See discussion supra at Section V.A.) The
ALJ therefore had no obligation to include in plaintiff's RFC the
limitations contained in the MSS completed by Dr. Leonberger.
Lacroix v. Barnhart, 465 F.3d 881, 887-88 (8th Cir. 2006).

A review of the ALJ's decision and the relevant evidence
of record shows the ALJ to have engaged in the proper analysis as
to plaintiff's RFC. Some medical evidence supports the ALJ's
determination and, for the following reasons, such determination is
supported by substantial evidence on the record as a whole.

First, with respect to the medical evidence of

plaintiff's mental impairments, the ALJ noted that plaintiff had one hospitalization in June 2009 relating to an overdose on Xanax after a recent breakup of a relationship; that plaintiff had never been treated by a psychiatrist but had a good therapeutic response to Xanax and Prozac as prescribed by her primary care physician; that a consultative examination showed plaintiff able to understand and remember simple instructions with adequate concentration and persistence with simple tasks; that a consultative examination showed plaintiff to have good social skills but with moderate limitations; that a State agency consultant, upon review of the evidence of record, found plaintiff able to perform simple and repetitive work tasks involving limited socialization; that plaintiff's treating physician documented plaintiff's back pain, depression, insomnia, and anxiety and prescribed medications therefor; that plaintiff's treating physician noted plaintiff to have normal judgment; that plaintiff was diagnosed by a consulting physician with major depression with good prognosis; that plaintiff was diagnosed by a consulting physician with dependent personality disorder; and that diagnostic testing showed plaintiff to have borderline intellectual functioning.

The ALJ also discussed the nonmedical evidence of record, noting specifically that plaintiff's claim that she becomes anxious around people was inconsistent with her shopping excursions once a month and her ability to engage in social activities with friends and family. See Goff, 421 F.3d at 790-91; Pearsall, 274 F.3d at

1218.  The ALJ also noted that plaintiff was never treated by a psychiatrist and was advised to undergo counseling, but that she did not do so.[16]  The ALJ noted plaintiff to have been prescribed medications for her impairments and that no significant adverse side effects from such medications appeared in the evidence of record.  In addition, the ALJ noted plaintiff's daily activities to include watching television, socializing on Facebook, and performing household chores.  The ALJ also noted plaintiff's poor work history.  See, e.g., Wildman, 596 at 968-69.  The ALJ further noted that plaintiff's complaints of concentration and memory problems were inconsistent with plaintiff's driving activity, including driving three hours to the administrative hearing.  Cf. Vandenboom, 421 F.3d at 750 (reports of decreased memory and poor concentration inconsistent with lack of restriction on driving).[17]

---

[16]Given plaintiff's repeated visits to her primary care physician for refills of her psychotropic medications, it does not appear that plaintiff's mental impairment itself prevented her from following through on such recommended psychiatric treatment.  Cf. Pate-Fires v. Astrue, 564 F.3d 935, 945-46 (8th Cir. 2009).

[17]Plaintiff did not challenge the ALJ's credibility determination in her Brief in Support of the Complaint.  In her Reply Brief, plaintiff raises for the first time that the ALJ erred in discounting plaintiff's credibility.  A review of the ALJ's decision shows that, in a manner consistent with and as required by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted), the ALJ thoroughly considered the subjective allegations of plaintiff's disabling symptoms on the basis of the entire record before him and set out numerous inconsistencies detracting from the credibility of such allegations.  The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole.  Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).  The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court

Finally, as discussed _supra_ at Sec. V.A, the ALJ discussed the medical opinion evidence of record regarding plaintiff's ability to engage in work-related activities, and accorded such opinions appropriate weight upon review of their consistency with the evidence contained in the record as a whole.

Upon conclusion of his discussion of specific medical facts, nonmedical evidence, and the consistency of such evidence when viewed in light of the record as a whole, the ALJ assessed plaintiff's mental RFC based on the relevant, credible evidence and specifically set out plaintiff's non-exertional limitations caused thereby and the effect of such limitations on plaintiff's ability to perform specific work-related activities.  Because some medical evidence supports this determination, the ALJ's RFC assessment must stand.  See Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008). Although not all the medical evidence "pointed in that direction," there nevertheless was a sufficient amount that did.  See Moad v. Massanari, 260 F.3d 887, 891 (8th Cir. 2001).  Because substantial evidence supports the ALJ's determination, it must be upheld, even if the record could also support an opposite decision.  Weikert, 977 F.2d at 1252.

C.    Chronic Mental Illness

Plaintiff contends that the ALJ failed to properly evaluate plaintiff's chronic mental illness under Section 12.00 of

---

is bound by the ALJ's determination.  Robinson, 956 F.2d at 841.

the Listings of Impairments. Specifically, plaintiff argues that the ALJ failed to consider longitudinal evidence of plaintiff's mental impairment, as required under § 12.00(D)(2); evidence of plaintiff's structured life, as required under § 12.00(E); evidence of the effects of medication, as required under § 12.00(G); and evidence of signs and symptoms of plaintiff's mental illness such as excessive sleep and low motivation, as required by § 12.00(A), (E). For the following reasons, plaintiff's contention is without merit.

As an initial matter, the ALJ considered whether plaintiff's mental impairments met or medically equaled an impairment listed under § 12.00 of the Listings of Impairments, and specifically §§ 12.04 (Affective Disorders), 12.05 (Mental Retardation), and 12.08 (Personality Disorders). (<u>See</u> Tr. 17-18.) Plaintiff identifies no other specific Listing and/or mental disorder that the ALJ should have, but failed to consider. With respect to the evidence to be considered as required under the introductory paragraphs to § 12.00, a review of the ALJ's decision shows him to have considered and properly evaluated such evidence in determining whether plaintiff was disabled under the Regulations.

First, contrary to plaintiff's assertion, the ALJ noted and thoroughly summarized the longitudinal evidence of record, and specifically plaintiff's treatment by Dr. LaBonte since at least 1997, with such treatment including medication for depression,

anxiety, back pain, and insomnia; plaintiff's hospitalization in June 2009; plaintiff's consultative evaluations conducted in 2010 and 2011; and plaintiff's most recent treatment by Dr. Moorehead in February 2011. The ALJ also summarized the longitudinal nonmedical evidence of record, including plaintiff's work activity from prior to 2003 and testimony and evidence as to plaintiff's daily activities.

To the extent plaintiff argues that the ALJ failed to consider the extent to which she structures her life so as to minimize stress, as required under § 12.00(E), the undersigned notes that § 12.00(E) addresses mental impairments in those persons "who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(E). The evidence fails to show plaintiff to be such an individual. Nevertheless, the ALJ did note in his written decision that plaintiff spent much of her time in bed, lived with her sister, and visited with only family and close friends. Plaintiff presents no argument or evidence demonstrating that she structured her life in a way not described by the ALJ. Nor does an independent review of the record as a whole reveal any additional structure. The ALJ did not err in his consideration of the manner and method by which plaintiff's life was structured so as to minimize stress.

In addition, the ALJ specifically noted the effects of plaintiff's psychotropic medications, observing in his decision

that the record showed plaintiff not to have experienced any significant adverse side effects from her medication and that she reported that her medication was effective.

Finally, to the extent plaintiff claims that the ALJ failed to consider evidence of signs and symptoms of plaintiff's mental illness, a review of the ALJ's decision *in toto* shows him to have thoroughly addressed and considered all of the medical evidence of record, plaintiff's complaints and reports to treating physicians and others, and plaintiff's treatment for her mental impairments and her response thereto. Although the ALJ did not specifically address plaintiff's reports of excessive sleep and low motivation, "an ALJ is not required to discuss every piece of evidence submitted." Wildman, 596 F.3d at 966 (internal quotations marks and citation omitted). Given the ALJ's thorough discussion of and citations to all of the evidence of record, including plaintiff's testimony that she stayed in bed for most of the day, it is "highly unlikely" that the ALJ's failure to specifically cite plaintiff's excessive sleep and low motivation indicates that such evidence was not considered. Id.

## VI. Conclusion

For the reasons set out above on the claims raised by plaintiff on this appeal, the ALJ's determination is supported by substantial evidence on the record as a whole and plaintiff's claims of error should be denied. Inasmuch as there is substantial evidence to support the Commissioner's decision, this Court may not

reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001); <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992). Accordingly, because there is substantial evidence on the record as a whole to support the ALJ's decision, the Commissioner's determination that plaintiff was not under a disability since November 12, 2009, should be affirmed.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that Acting Commissioner of Social Security Carolyn W. Colvin be substituted for former Commissioner Michael J. Astrue as defendant in this cause.

**IT IS FURTHER RECOMMENDED** that the decision of the Commissioner be affirmed and that plaintiff's Complaint be dismissed with prejudice.

The parties are advised that any written objections to this Report and Recommendation shall be filed not later than **July 23, 2013.** Failure to timely file objections may result in waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).



UNITED STATES MAGISTRATE JUDGE

Dated this <u>9th</u> day of July, 2013.